# Worldwide Language Resources, Inc. v. Mission Essential Personnel LLC *et al.*

## Exhibit B to Notice of Removal

## Materials Filed with North Carolina Superior Court

# STATE OF NORTH CAROLINA

Cumberland _____ County

File No.
**08 CVS** 7995

In The General Court Of Justice
☐ District  ☑ Superior Court Division

*me Of Plaintiff*
orldwide Language Resources, Inc.

*Address*
308 Person Street

*City, State, Zip*
Fayetteville NC 28301

## CIVIL SUMMONS

☐ Alias And Pluries Summons

G.S. 1A-1, Rules 3,4

### VERSUS

*Name Of Defendant*
Mission Essential Personnel, LLC and Ramazan Ruzgani

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

---

To Each Of The Defendant(s) Named Below:

| *Name And Mailing Address Of Defendant 1* | *Name And Address Of Defendant 2* |
|---|---|
| Mission Essential Personnel<br>c/o CT Corporation System, Registered Agent<br>1300 East 9th Street<br>Cleveland, OH  44114 | Ramazan Ruzgani<br>19210 Corwin Road<br>Apple Valley, CA  92307 |

A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or the plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to this plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address of Plaintiff)* | *Date Issued* 8-6-08 | *Time Issued* 2:01 ☐ AM ☑ PM |
|---|---|---|
| Benjamin N. Thompson<br>Wyrick Robbins Yates & Ponton LLP<br>4101 Lake Boone Trail, Suite 300<br>Raleigh   NC   27607 | *Signature* | |
| | ☑ Deputy CSC  ☐ Assistant CSC  ☐ Clerk of Superior Court | |

| ☐ ENDORSEMENT | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| This summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Signature* | |
| | ☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk of Superior Court | |

NOTE TO PARTIES:  *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount is in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and , if so, what procedure is to be followed.*

AOC-CV-100, Rev.10/01
2001 Administrative Office of the Courts                    (Over)

STATE OF NORTH CAROLINA

COUNTY OF CUMBERLAND

WORLDWIDE LANGUAGE
RESOURCES, INC.,

Plaintiff,

v.

MISSION ESSENTIAL PERSONNEL,
LLC and RAMAZAN RUZGANI,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO.: 08 CVS 7995

VERIFIED COMPLAINT
AND MOTIONS FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY
AND PERMANENT INJUNCTIONS

Plaintiff Worldwide Language Resources, Inc. ("WWLR"), by and through the undersigned attorneys, complaining of Defendants Mission Essential Personnel, LLC ("MEP") and Ramazan Ruzgani ("Ruzgani"), hereby alleges and says:

## INTRODUCTION

1.   This is an action for breach of contract, unfair competition and/or deceptive trade practices, tortious interference with contract, tortious interference with prospective economic advantage, and equitable relief.

2.   Suit is brought by WWLR, a government contractor who provides linguistic support services to the U.S. Government in Afghanistan, against its direct competitor (MEP) and a former employee (Ruzgani).

3.   With respect to Ruzgani, WWLR seeks damages and other relief for Ruzgani's breach of a covenant not to compete.

4.   With respect to MEP, WWLR seeks damages and other relief for MEP's tortious interference with Ruzgani's covenant not to compete, MEP's tortious interference with WWLR's

PLDG-20943-2-545887-02

prospective economic advantage related to the employment or other engagement of certain prospective employees and/or independent subcontractors, and MEP's raiding of WWLR's current and prospective employees and/or independent subcontractors.

5. Because some of the harm caused by Defendants' unlawful conduct is ongoing, immeasurable and irreparable, WWLR also seeks a temporary restraining order, and preliminary and permanent injunctions to prohibit Defendants from continuing their unlawful conduct.

6. This action is commenced within all applicable statutes of limitations and repose.

7. There are no unperformed conditions precedent to the bringing of this action.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this civil action in which WWLR seeks injunctive relief, actual damages in excess of Ten Thousand Dollars and no/100 ($10,000.00) and other relief.

9. Some or all of the unlawful acts done, being done and/or apprehended to be done, for which relief is sought, was, is being, or will be done in Cumberland County, North Carolina.

10. Accordingly, jurisdiction is established and venue is proper.

## PARTIES

### Plaintiff WWLR

11. WWLR is a corporation organized and existing under the laws of the State of Massachusetts. Plaintiff is registered and duly authorized to conduct business in North Carolina.

12. WWLR operates a place of business located at 308 Person Street, Cumberland County, Fayetteville, North Carolina 28301.

999999.9-545887 v2                              2

**Defendant MEP**

13.    On information and belief, Defendant MEP is a limited liability company organized and existing under the laws of the State of Ohio with its principal office and place of business in Columbus, Ohio.

14.    According to MEP's website, MEP maintains an office in Fayetteville, North Carolina, and MEP is currently recruiting employees to work in North Carolina. A true and accurate copy of excerpts from MEP's website is attached hereto as **Exhibit A** and incorporated herein by reference.

15.    Some of the acts of MEP alleged herein giving rise to this action occurred in Fayetteville, North Carolina.

**Defendant Ruzgani**

16.    Defendant Ruzgani is a citizen and resident of Apple Valley, California.

17.    Ruzgani is neither a minor nor incompetent.

18.    Ruzgani was, until August 5, 2008, employed by WWLR as a linguist.

19.    As such, Ruzgani has had substantial contacts with WWLR's Fayetteville, North Carolina office, including undergoing processing to become approved as a linguist (which procedure is described herein) in Fayetteville, North Carolina.

20.    Ruzgani executed an Independent Subcontractor Agreement with WWLR in which he agreed that that Agreement "may be enforced in any court of competent jurisdiction within the State of North Carolina."

## FACTUAL ALLEGATIONS

### WWLR's Contract To Provide Linguistic Support

21.     Plaintiff WWLR is a diverse language services company providing language-related services such as linguists, interpreters, cultural advisors, language training, and translation services to, inter alia, the United States Government and Department of Defense organizations.

22.     On or about September 24, 2004, WWLR was awarded a contract (the "Contract") with the Bagram Contracting Office, Bagram Airfield, Afghanistan, to provide linguistic support to Military Intelligence operations, Civil Military Operations, Force Protection operations and numerous other military operations in support of the Combined/Joint Task Force, Operation Enduring Freedom in Afghanistan.

23.     Under the Contract, WWLR is to furnish linguists to provide translation and interpretation services as required by the supported forces up to 24 hours a day, 7 days a week. Linguists must have a native proficiency in one of the Contract's target languages, must be screened by U.S. Army Counterintelligence, and must possess (at a minimum) a SECRET clearance. Linguists are based at the Bagram Airfield, Afghanistan, and must be willing to live and work in an area designated by the U.S. government as an imminent danger zone or hostile fire zone.

24.     The Contract provides for as many as 100 linguists. WWLR currently employs approximately 80 linguists under the Contract.

### WWLR's Substantial Investment In Recruiting & Retaining Qualified Linguists

25.     WWLR spends a great amount of time, effort and resources to recruit linguists and to process them for service under the Contract.

26.    Once a potential recruit is identified, the recruit undergoes language testing to determine the recruit's language proficiency, as well as physical and other examinations, all at WWLR's expense.

27.    WWLR then completes background and credit checks on the recruit, at WWLR's expense.

28.    WWLR then assists the recruit in obtaining any documentation needed to obtain a security clearance, such as passports and naturalization certificates for the recruit and his or her family.

29.    WWLR also assists the recruit in completing Standard Form 86, Questionnaire for National Security Positions, a fairly onerous form necessary to obtain a security clearance, which requires the recruit to report employment, education, residence, and foreign travel for the last seven years, and to provide information regarding the recruit's family, financial history, medical history, criminal background, etc.  This form is submitted to the U.S. Government's Defense Security System for processing and consideration.  If approved, the U.S. Government will issue an interim security clearance to the recruit.

30.    The recruit must then be submitted to U.S. Counterintelligence for a Contract Linguists Information Program ("CLIP") screen, which generally takes a minimum of thirty days to complete.

31.    The recruit then undergoes a lengthy interview with the U.S. Department of Defense to, inter alia, assess the recruit's loyalty to the United States.

32.    Only after this entire process is complete is a recruit able to begin work on the Contract as a linguist.

33.    All of WWLR's recruits are processed in Fayetteville, North Carolina.

34.     Once WWLR recruits and processes a linguist for service under the Contract, the linguist is deployed to Afghanistan, where the U.S. military manager determines what specific work and duties each of the linguists will be assigned to perform.

35.     Because WWLR does not determine what linguists will do once they are deployed to Afghanistan, the major burden under WWLR's Contract is to recruit and process linguists.

36.     In this regard, the success or failure of a contractor in this field depends in large part on its ability to recruit and retain qualified linguists.

37.     Because of the time, expense and effort dedicated to locating and processing recruits, WWLR requires that each of their recruits sign employment or independent contractor agreements that include, among other post-employment restrictions, covenants not to compete. WWLR's covenants not to compete generally restrict its linguists from providing linguist services to a competitor of WWLR during the term of the agreement and for nine months thereafter.

**MEP's Tortious Interference and Raiding Scheme**

38.     On or about September 21, 2007, the United States Army Intelligence and Security Command awarded a contract ("MEP's Contract") to MEP for linguist translation and interpretation support for Operation Enduring Freedom in Afghanistan.

39.     On information and belief, the linguist services required under MEP's Contract are substantially similar to the linguist services required under WWLR's Contract, and the linguists employed by MEP are also based at the Bagram Airfield in Afghanistan.

40.     WWLR recently became aware that MEP has been engaging in a scheme designed to raid WWLR's linguists under the Contract in direct violation of the covenants not to compete signed by each of those linguists.

999999.9-545887 v2                                6

41.     Specifically, on or about July 31, 2008, MEP held a dinner for WWLR's linguists in Afghanistan. At the dinner, MEP representatives distributed a flyer to WWLR's linguists in an effort to entice those linguists to work for MEP, in violation of their employment or independent subcontractor agreements with WWLR and the covenants not to compete contained therein. A true and accurate copy of the flyer distributed by MEP is attached hereto as **Exhibit B** and incorporated herein by reference. By specifically targeting WWLR's active linguists, MEP could circumvent the lengthy, expensive and onerous processing procedure, which would have already been completed by WWLR with regard to WWLR's linguists that MEP was targeting.

42.     On August 3, 2008, Scott James, WWLR's Regional Manager in Afghanistan, was advised by Lieutenant Ryan Barlow, WWLR's Contracting Officer's Representative (a representative of the U.S. Government) that one of the Counterintelligence screeners, Tom Raebel, had advised Lt. Barlow that MEP had requested CLIP checks on four of WWLR's employees/independent contractors, those being Ramazan Ruzgani, Saeed Iqbal, Yasmin Nighat, and Abdul Tabibi. All four of those WWLR employees/independent contractors had executed WWLR's Independent Subcontractor Agreement, including the covenant not to compete.

43.     On August 4, 2008, Mr. James was informed by Lt. Barlow that six of WWLR's linguists were in the process of signing contracts with MEP.

44.     On August 4, 2008, Lt. Barlow informed Lawrence Costa, President of WWLR, that the Contracting Officer Representative for MEP's Contract had informed Lt. Barlow that MEP was writing contracts for at least 21 of WWLR's linguists.

45.     MEP's scheme to take over 20 of WWLR's linguists would decimate WWLR's work force under the Contract, given that the raided linguists would comprise 25% of WWLR's linguist work force under the Contract.

46.    WWLR also recently became aware that MEP has been engaging in a scheme designed to raid WWLR's recruits during processing.

47.    Specifically, on or about July 30, 2008, four representatives of MEP (including Ahmad Shafi Ahmadi, Recruiting Specialist; Noorullah Akbari, Recruiting Specialist; Dan (last name unknown), Marketing Manager; and Brian (last name and title unknown) approached four of WWLR recruits during processing in Fayetteville, North Carolina and invited them to dinner for the purpose of, on information and belief, enticing WWLR's recruits to come work for MEP.

48.    On or about July 31, 2008, four MEP representatives met again with some of WWLR's linguists currently processing to deploy in Fayetteville, North Carolina.

49.    On information and belief, the intent of both the July 30, 2008 dinner and the July 31, 2008 meeting was to entice WWLR's recruits to come work for MEP. In addition, during the course of the discussion, MEP's representatives asked WWLR's recruits questions about WWLR's pay, clearances, processing, etc. At least one of WWLR's recruits Ahmad Kahttak was specifically told by one of the MEP representatives to "get your clearance, quit, and come with us."

50.    One of WWLR's recruits, Daoud Zadran, informed Michael Ferreyra, WWLR's Conus Replacement Center Coordinator, that he had declined an invitation from a MEP representative to go to dinner, and that the MEP representative had questioned "how well" he was treated by WWLR, told Mr. Zadran that MEP would pay him more than WWLR would if Mr. Zadran would come over to MEP, and that if Mr. Zadran knew anyone else, or could convince anyone else to joint MEP, that MEP would pay Mr. Zadran a bonus.

**Ruzgani's Independent Subcontractor Agreement with WWLR**

51.    On or about January 8, 2008, at the commencement of the term of his employment with WWLR, Ruzgani executed an Independent Subcontractor Agreement (the "Agreement") with WWLR. A true and accurate copy of the Agreement is attached hereto as **Exhibit C** and incorporated herein by reference. Under the terms of the Agreement, Ruzgani agreed to provide translation and interpretation services to the United States government as an independent subcontractor, with these services contracted in support of WWLR's Contract with the Government.

52.    Pursuant to Paragraph 12 of the Agreement, Ruzgani agreed as follows:

**Covenant Not To Compete/Project Extension:**    Subcontractor acknowledges that, as a result of performance of this Agreement, he or she likely will gain substantial knowledge, contacts and Confidential and Proprietary Information in connection with WWLR's business, and that he or she may develop the capability and reputation at WWLR's expense which could enable him or her to compete with WWLR in the business of providing linguists or other personnel capable of providing translation and interpretation services and/or other services, including but not limited to analyst and screener services, sought by the United States government. The Subcontractor further acknowledges that WWLR invests a significant amount of time and effort to provide advanced training and support to its Subcontractors generally, and to Subcontractor in particular. WWLR desires that the Subcontractor not use his or her knowledge of WWLR's business and/or its Confidential and Proprietary Information, contacts, reputation and Confidential and Proprietary Information gained from his or her work with WWLR in a manner which may diminish or impair the value of WWLR's Agreement with the Subcontractor.    **For this reason, the Subcontractor covenants and agrees that for the entire term of the Agreement, and for 9 (nine) full months thereafter, he or she will not, whether on his or her own behalf or on behalf of any other person or entity, including but not limited to the United States government, compete with WWLR in any manner, either directly or indirectly, with respect to providing any product or service offered by WWLR, including but not limited to providing analyst, screener, translation and interpretation services or linguists or other personnel capable of providing translation and interpretation services and/or other services, including but not limited to analyst and screener services, sought by the United States government, in the Placement Area or the Placement Areas where the Subcontractor has worked under this Agreement.**

53.    As noted herein, on or about On August 3, 2008, Scott James, WWLR's Regional Manager in Afghanistan, was advised by Lieutenant Ryan Barlow, WWLR's Contracting Officer's Representative (a representative of the U.S. Government) that one of the Counterintelligence screeners, Tom Raebel, had advised Lt. Barlow that MEP had requested CLIP checks on four of WWLR's employees, including Ruzgani.

54.    On August 5, 2008, Ruzgani confirmed to Scott James, Regional Manager for WWLR, that Ruzgani had signed a contract with MEP. James advised Ruzgani at that time that Ruzgani's actions were in violation of the covenant not to compete contained in the Agreement.

## MOTION FOR TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

55.    WWLR repeats and re-alleges the allegations in the preceding paragraphs as though set forth in full herein.

56.    WWLR is likely to succeed on the merits of its claims against Defendants MEP and Ruzgani as alleged herein.

57.    Defendant MEP grossly overstepped the bounds of decency and fair competition when it launched an orchestrated "raid" of both WWLR's linguists (without regard for the valid and enforceable restrictive covenants prohibiting such employment or engagement) and of WWLR's prospective linguists for malicious purposes.

58.    Despite the fact that Defendant Ruzgani signed and agreed to an Independent Subcontractor Agreement containing reasonable and necessary post-employment covenants (non-solicitation, non-disclosure and non-competition) as a condition of his engagement with WWLR, Defendant Ruzgani has signed a contract to begin employment as a linguist in Afghanistan with Defendant MEP in breach and violation of the Agreement.

59.    Once Defendant MEP's scheme of unlawful competition and tortious interference with Ruzgani's Agreement was exposed, Plaintiff WWLR informed Ruzgani that his actions violated his Agreement, and WWLR sent a written cease and desist letter to MEP, a copy of which is attached hereto as **Exhibit D** and incorporated herein by reference. However, as of the filing of this pleading, neither Ruzgani nor MEP has provided assurances to WWLR that their illegal conduct will cease.

60.    Notwithstanding WWLR's efforts to enforce Ruzgani's Agreement, Defendant Ruzgani, upon information and belief, continues his employment or other engagement to provide linguistic support services with MEP within the time and territory restricted by his Agreement.

61.    WWLR has no adequate remedy at law which will prevent Defendant Ruzgani from continuing to violate his Agreement or Defendant MEP from continuing to aid and abet Ruzgani in the violation of his Agreement and otherwise continuing its raid on WWLR's current and prospective linguists.

62.    In Paragraph 15 of the Agreement, Ruzgani specifically agreed that WWLR would be entitled to injunctive relief in the event of a breach of the Agreement by Ruzgani:

> 15. **Enforcement of Agreement and Injunctive Relief:** The parties agree that Subcontractor's violation of any of the covenants contained in this Agreement will cause irreparable harm to WWLR, and further agree that WWLR shall have the right to immediate injunctive relief. This remedy shall not be exclusive and shall be in addition to any other remedies available at law or equity.

63.    Likewise, WWLR has no adequate remedy at law which will prevent Defendant MEP from continuing its scheme of unfair competition and/or deceptive trade practices.

64.    Because WWLR has no adequate remedy at law, and, in the absence of temporary, preliminary and permanent injunctive relief, WWLR will suffer immediate, irreparable harm, WWLR moves this Court for entry of a temporary restraining order and

preliminary and permanent injunctions, pursuant to Rule 65, North Carolina Rules of Civil Procedure, compelling Ruzgani to honor the Agreement that he signed and agreed to as a condition of his engagement with WWLR, and enjoining and restraining Defendant MEP from continuing to aid and abet Ruzgani in the violation of his Agreement and from continuing its scheme of unfair competition and/or deceptive trade practices.

65.     With respect to Defendant Ruzgani, WWLR specifically seeks a temporary restraining order and preliminary and permanent injunctions, pursuant to Rule 65, North Carolina Rules of Civil Procedure, enjoining and restraining Defendant Ruzgani from: (a) Continuing employment or other engagement with MEP (or with any other person or entity), directly or indirectly, in any capacity that violates Ruzgani's Agreement with WWLR; (b) Soliciting or interfering with WWLR's existing or prospective employees in violation of the Agreement; or (c) Continuing to use or disclose, either independently or through any third-parties, WWLR's proprietary and confidential business information and/or trade secrets in violation of the Agreement or North Carolina statutory or common law.

66.     With respect to Defendant MEP, WWLR specifically seeks a temporary restraining order and preliminary and permanent injunctions, pursuant to Rule 65, North Carolina Rules of Civil Procedure, enjoining and restraining Defendant MEP from (i) Continuing to aid and abet Defendant Ruzgani in the violation of his Agreement with WWLR or otherwise interfering with Ruzgani's Agreement with WWLR; (ii) Employing or otherwise engaging any current or former WWLR employee or subcontractor restricted by contract from such employment or other engagement; and (iii) Compensating any current or former employee or subcontractor for employment or other engagement prohibited by such employees' or subcontractors' contract(s) with WWLR.

67.    Enforcement of the Agreement, pursuant to the agreed upon terms, will not operate to cause any undue hardship on Defendants

68.    The public interest will not be adversely affected by issuance of the injunctive relief sought herein.  In fact, the public interest is furthered by the enforcement of legally binding contracts such as the Agreement, and preventing tortious interference with such agreements.

**COUNT ONE**
**BREACH OF CONTRACT**
**(Defendant Ruzgani)**

69.    WWLR repeats and re-alleges the allegations in the preceding paragraphs as though set forth in full herein.

70.    In consideration for his engagement as an independent subcontractor, Defendant Ruzgani entered into, and agreed to be bound by, the terms of the Agreement attached hereto as **Exhibit C**.

71.    The Agreement is written, valid and enforceable.

72.    The Agreement is supported by adequate consideration.

73.    WWLR has a protectable interest in the Agreement, and the restrictive covenants in the Agreement are reasonably related to WWLR's protectable interest.

74.    The restrictive covenants contained in the Agreement are (a) in writing; (b) reasonable as to terms, time and territory; (c) made as part of the independent subcontractor contract; (d) based on valuable consideration; and (e) not against public policy.

75.    Ruzgani's present employment or other engagement by MEP is in direct violation of Paragraph 12 of Defendant Ruzgani's Agreement with MEP.

76. Defendant Ruzgani, by the conduct described above, has breached the Agreement and damaged Plaintiff in an amount exceeding $10,000, the exact amount to be determined at trial.

## COUNT TWO
## UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Defendants Ruzgani and MEP)

77. WWLR repeats and re-alleges the allegations in the preceding paragraphs as though set forth in full herein.

78. The actions of Defendants as alleged herein were in or affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1.

79. The actions of Defendants alleged herein were unfair or deceptive within the meaning of N.C. Gen. Stat. § 75-1.1.

80. Defendants willfully engaged in the activities which violated N.C. Gen. Sat. § 75-16.1, and there has been an unwarranted refusal by Defendants to fully resolve the matters which constitute the basis for this action.

81. WWLR has been and will be actually damaged by th unfair and deceptive actions of Defendants in violation of N.C. Gen. Stat. § 75-1.1 and within the meaning of N.C. Gen. Stat. § 75-16.

82. WWLR is entitled to judgment against Defendants for treble the amount of damages determined at trial pursuant to N.C. Gen. Stat. § 75-16.

83. WWLR is entitled to recover its reasonable attorneys' fees from Defendants pursuant to N.C. Gen. Stat. § 75-16.1.

## COUNT THREE
## COMMON LAW UNFAIR COMPETITION
### (Defendants Ruzgani and MEP)

84.    WWLR repeats and re-alleges the allegations in the preceding paragraphs as though set forth in full herein.

85.    Defendants' actions, as more fully described and alleged above, were unfair and deceptive trade practices and constitute unfair competition under North Carolina common law.

86.    Defendants willfully engaged in the activities that constitute tortious unfair competition under North Carolina common law.

87.    WWLR has been and will be damaged by Defendants' acts amounting to unfair competition in an amount to be proved at trial.

## COUNT FOUR
## TORTIOUS INTERFERENCE WITH CONTRACT
### (Defendant MEP)

88.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as though set forth in full herein.

89.·   Ruzgani's Agreement is a valid and enforceable contract.

90.    At all times relevant, Defendant MEP had knowledge that WWLR has contracts with its linguists (which would include the covenants not to compete and which would include Ruzgani's Agreement).  Specifically, in or about the end of July of 2008, Lawrence Costa, President of WWLR, had a discussion with Chad Monnin, Chief Executive Officer of MEP. During that discussion, Mr. Monnin asked Mr. Costa if WWLR was interested in working with MEP in connection with MEP's Contract.  Mr. Costa advised Mr. Monnin that WWLR was not interested and that WWLR had contracts with all of its linguists.

91.     Upon information and belief, Defendant MEP, without justification, intentionally induced Defendant Ruzgani to breach the Agreement.

92.     Upon information and belief, Defendant MEP, without justification, has interfered with, and continues to interfere with, Plaintiff's contractual relationship with Ruzgani and reasonable business expectations with respect to the same.

93.     Upon information and belief, Defendant MEP's interference with Plaintiff's contractual relationship and reasonable business expectations with respect to the same was and is intentional, malicious and without legal or business justification.

94.     As a result of the Defendant MEP's intentional interference with Plaintiff's contractual relationship with Ruzgani and reasonable business expectations with respect to the same, Plaintiff has suffered, and in the absence of preliminary and permanent injunctive relief will continue to suffer, measurable and immeasurable damages and irreparable harm.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Defendant MEP)

95.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as though set forth in full herein.

96.     With malicious intent to cause economic damage to WWLR, Defendant MEP solicited and induced prospective employee/subcontractor linguists to complete costly and involved processing at WWLR's expense before terminating their planned employment or other engagement with WWLR in order to instead accept employment or other engagement with MEP providing the same linguistic support services in Afghanistan.

97.     At that time, MEP had knowledge of (a) such prospects were undergoing processing at WWLR's expense, and (b) WWLR's reasonable expectation that, following the

processing, such prospects would enter into employment or independent subcontractor agreements with WWLR to provide linguistic support services for WWLR in Afghanistan.

98.   With no legal justification, and malicious intent, Defendant MEP employed improper methods to solicit and induce away such prospective employees and/or independent subcontractors in order to induce such prospective employees/contractors to contract for employment or engagement with MEP and not to contract with WWLR.

99.   Absent the intentional and malicious misconduct of Defendant MEP, the prospective employees/contractors would have contracted for employment or an independent subcontractor engagement with WWLR, and WWLR would have realized an economic benefit as a result of the same since it is paid by the U.S. Government for each linguist provided under its Contract.

100.   As a result of Defendant MEP's intentional interference with WWLR's employment or other engagement of the prospective employees and/or contractors, and reasonable business expectations with respect to the same, WWLR has suffered, and in the absence of a temporary restraining order and preliminary and permanent injunctive relief will continue to suffer, measurable and immeasurable damages and irreparable harm.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff WWLR respectfully prays for the following relief:

1.   That the Court accept this Verified Complaint as an affidavit in support of the entry of a Temporary Restraining Order immediately prohibiting Defendant Ruzgani from:

      a.   Continuing employment or other engagement with MEP (or with any other person or entity), directly or indirectly, in any capacity that violates Ruzgani's Agreement with WWLR;

      b.   Soliciting or interfering with WWLR's existing or prospective employees in violation of the Agreement; or

      c.     Continuing to use or disclose, either independently or through any third-parties, Plaintiff's proprietary and confidential business information and/or trade secrets in violation of the Agreement or North Carolina statutory or common law.

2.     That the Court accept this Verified Complaint as an affidavit in support of the entry of a Temporary Restraining Order immediately prohibiting Defendant MEP from:

      a.     Aiding and abetting Defendant Ruzgani in the violation of his Agreement with WWLR and otherwise interfering with Defendant Ruzgani's Agreement with WWLR;

      b.     Employing or otherwise engaging any current or former WWLR employee or subcontractor restricted by contract from such employment or other engagement; and

      c.     Compensating any current or former employee or subcontractor for employment or other engagement prohibited by such employees' or subcontractors' contract(s) with WWLR.

3.     That following notice of hearing, the Court enter a preliminary injunction continuing these prohibitions during the pendency of this action;

4.     That following a determination on the merits of WWLR's claims against Defendants herein, that the Court enter an order directing Defendant Ruzgani to specifically perform his obligations under the Agreement (**Exhibit C**);

5.     That the Court order Defendant Ruzgani to pay WWLR its actual damages in a sum in excess of $10,000.00, treble its actual damages and/or punitive damages;

6.     That the Court order Defendant MEP to pay WWLR its actual damages in a sum in excess of $10,000.00, treble its actual damages in accordance with North Carolina General Statute § 75-1 et seq. and/or punitive damages;

7.     That all costs of this action including attorneys' fees be charged to Defendants as authorized by North Carolina General Statute § 75-16.1; and

8. That the Court grant WWLR such other and further relief as it deems just and proper.

This the 6ᵗʰ day of August, 2008.

WYRICK ROBBINS YATES & PONTON LLP

By:  _____

Benjamin N. Thompson, N.C. Bar 9005
Jennifer M. Miller, NC Bar No. 25340
J. Kellam Warren, NC Bar No. 26811
Post Office Drawer 17803
Raleigh, NC 27619
Telephone: (919) 781-4000
Facsimile: (919) 781-4865

COUNSEL FOR PLAINTIFF

## VERIFICATION

The undersigned, being first duly sworn, hereby deposes and says that he is over eighteen years of age; has not been declared incompetent, is Director of Operations of the plaintiff; is authorized to make affidavits and verifications on behalf of the plaintiff; has read the foregoing verified complaint; and that he knows the contents thereof to be true of his own knowledge or based upon records in the possession and custody of plaintiff and, therefore, within his knowledge, and as to those instances in which allegations are made upon information and belief, are true to the best of his knowledge, information, and belief.

This the _06_ day of August, 2008.

_Gene Battistini_
Gene Battistini
Director of Operations

STATE OF NORTH CAROLINA

~~CUMBERLAND~~ Hoke COUNTY

Sworn to and subscribed before me this the _6_ day of August, 2008.

_Christ_ _____
Notary Public

My Commission Expires:

_6_|_8_|_2013_



(SEAL)



## We Provide Certainty

### Recent News

**A New Era in Certainty**
Aegis, Mission Essential Personnel formally changes
name to reflect core business.          ... read more >>

**Expansion Supports INSCOM**
Aegis MEP expands into MD, VA and GA to support
U.S. Army INSCOM.                        ... read more >>

Mission Essential Personnel is an international personnel and managemer
company that brings applied and accomplished experience to your speciali
requirements for national security and corporate objectives.

From comprehensive project management and operational support to cust
training, language and expeditionary services, our solutions are designed t
your specific requirements.

Privacy Statement | Tern

© 2008 Mission Essential Personnel, LLC


EXHIBIT

A

http://www.missionep.com/

8/6/200



## MISSION ESSENTIAL
### P E R S O N N E L

Home > Our Company

History

Locations

Contact Us



" Our comm
goal is to l
recognize(
the global
in specialis
operationc
support."

## Our Company

IT'S THE PEOPLE THAT MAKE OUR COMPANY SPECIAL. WITH OVER 3,000
EMPLOYEES AND CUSTOMERS FROM NORTH CAROLINA TO AFRICA, OUR
DAY BEGINS AND ENDS WITH THE COMMITMENT OF TALENTED PEOPLE.

Our Mission: To provide certainty for our customers.

Our company processes and the decisions of our people are dedicated to
this purpose every day. Our common goal is to be recognized as the global
leader in specialized operational support.

Our customers include the Department of Defense, members of the
intelligence community, other government agencies and Fortune 500 ®
companies.

© 2008 Mission Essential Personnel, LLC

Privacy Statement | Terr



**MISSION ESSENTIAL**
**P E R S O N N E L**

Home > Our Company > Locations

History

Locations

Contact Us



## Company Headquarters
4343 Easton Commons, Suite 100
Columbus, OH 43219

Phone: +1 (614) 416 2345
Fax: +1 (614) 416 2346
Toll Free: +1 (888) 542 3447

**Office Locations**
Augusta, GA
Columbus, GA
Fayetteville, NC
Linthicum, MD
Lorton, VA
Mainz, Germany

© 2008 Mission Essential Personnel, LLC

Privacy Statement | Ten



Benefits

Careers

Online Application

Returning Applicants
Click Here

Mission Essential Personnel, LLC is a professional services firm that supports the unique requirements of its clients. Our firm's focus is on serving its client's global markets needs worldwide. We do this by providing highly qualified personnel with language, security, training, and business related backgrounds.  All positions require experience in one or more of the following areas:

- accounting, accounting management
- business management/project management
- human resources, human resources management
- information technology, information technology project management
- translators, interpreters , and other  language specialists
- military special operations, military police, security or security force management
- recruiting, recruiting management

© 2008 Mission Essential Personnel, LLC

Privacy Statement | Tem

8/6/2008

Click on the Position Title to select the desired position.

view additional information about a specific position click on the title listed below.

To Return to the Jobs Home Page Click Here

| Position | Division | Location | FT/PT/Contract |
|---|---|---|---|
| Business Development Manager | Business Development | Ft. Bragg - Fayetteville, NC | Full Time |
| Capture Manager | Business Development | Other | Full Time |
| Proposal Manager | Business Development | Columbus, Ohio | Full Time |
| Proposal Writer | Business Development | Columbus, Ohio | Full Time |

Case 5:08-cv-00373-D   Document 1-2   Filed 08/11/08   Page 27 of 45

### WELCOME TO MISSION ESSENTIAL PERSONNEL

# ATTENTION:
# ALL QUALIFIED U.S. LINGUISTS

 

## $10,000 Completion Payment after 15-days!

We greatly look forward to having you join our company and become a member of Mission Essential Personnel, a company where TEAM comes first. We are prepared to transition you quickly and smoothly.

- > Your employment transition will take place in Afghanistan
- > You will NOT miss a Pay Cycle
- > Average CAT II salary is $200,000 annually
- > Health Insurance, Life Insurance, 401 (k), Paid Travel Benefit
- > Long Term Job Stability
- > $10,000 15-day Mission Essential Personnel Completion Payment
- > Preferred employee status for future positions with Mission Essential Personnel (CONUS/OCONUS)

**CALL or E-MAIL our team TODAY!**

ROSHAN: 079 578 3697
TOLL FREE: 1 888 542 3447
E-MAIL: AFG@missionep.com
Subject Line: Hire Me

WEB SITE: www.missionep.com

## MISSION ESSENTIAL
### P E R S O N N E L

*Your future is with Mission Essential Personnel, welcome aboard!*

ALL-STATE LEGAL®

EXHIBIT

B



# WORLDWIDE LANGUAGE RESOURCES, INC.

## INDEPENDENT SUBCONTRACTOR AGREEMENT

### January 8, 2008

| Subcontractor: | Ruzgani, Ramazan NMN | Language: | Pashto |
| --- | --- | --- | --- |
| Address: | 19210 Corwin Road | Date of Birth: | 06/02/1941 |
| | Apple Valley, California 92307 | Place of Birth: | URUZGAN, AFGANISTAN |
| Telephone: | 760-242-2038 | Scheduled Start Date: | 01/10/2008 |
| SSN: | REDACTED | Scheduled End Date: | 07/09/2008 |

THIS INDEPENDENT SUBCONTRACTOR AGREEMENT (the "Agreement") is entered into as of the date stated above, between the Subcontractor and WorldWide Language Resources, Inc. ("WWLR"), a Massachusetts corporation registered to do business in North Carolina, and having its principal place of business in Fayetteville, North Carolina. The terms "Subcontractor," "Language," "Scheduled Start Date," and "Scheduled End Date," as used throughout the Agreement, shall have the meanings provided above. The term "Placement Area" shall mean the country or countries in which the Subcontractor has been deployed to perform services under this Agreement. The term "Project" shall mean the Project or projects for which the Subcontractor has contracted to work under this Agreement. Subcontractor may be redeployed to any Placement Area or Project during the term of this Agreement, and all terms in this Agreement shall remain in full force and effect.

_R.R._ 1.    **Services to be provided:** Subcontractor will provide translation and interpretation services to the United States government as an independent subcontractor under this Agreement. These services are contracted in support of the Project and will be provided at the times and places requested by Project participants or as otherwise directed by the customer, i.e. the United States government. The Project may change as the needs of the United States government or any of its contractors may change. Possession of at least an interim secret clearance from DSS shall be a pre-condition for entering into this Agreement and for providing any services and receiving any payments under this Agreement.

_R.R._ 1.1.    **Down range assignments:** The Subcontractor agrees that the proper performance of this Agreement may require "down range" duty. "Down range" is defined as any duty that involves traveling with United States government or other military units into hostile or non- "Green Zone" areas. Both parties acknowledge that performance of linguist services down range is vital to the missions carried out under this Agreement.

Under this Agreement, the Subcontractor agrees to perform assigned duties down range when required, and agrees that down range duty is an essential component of the Subcontractor's duties. If the performance of this Agreement requires down range duty, and the Subcontractor refuses to perform such duty, the United States government and/or WWLR may terminate this Agreement. If the United States

WorldWide Language Resources, Inc.
308 Person Street, Fayetteville, NC 28301 Tel: (910) 483-2881 Fax: (910) 483-2470

For internal use only
ID: 1844
Revision: IL111907-1

Project: 76-106
Placement: Afghanistan
Program Manager: Amy Sweeney

**REDACTED**

EXHIBIT

C

ALL-STATE LEGAL®

government or WWLR terminates this Agreement because of Subcontractor's refusal to perform down range duty, Subcontractor shall: (a) be subject to security clearance termination; (b) be responsible for funding travel out of assigned duty location; and, (c) shall immediately forfeit the right to any further payments under this Agreement.

R.R.  2.        **Term:** The Subcontractor shall provide services under this Agreement for the period set forth above in the Scheduled Start Date and Scheduled End Date. The Project and services described herein, shall be contracted for and funded by the United States government. In the event the Project is terminated for any reason at any time before the Project is completed, the Subcontractor shall receive no further payment for any services and shall have no obligation to provide any further services. WWLR shall have no liability to the Subcontractor if the Agreement is terminated because of the termination of the Project.

Notwithstanding the Scheduled Start Date identified and referred to above, the term of this Agreement shall not commence (and the right to receive any payments or to perform any services under this Agreement shall not commence) unless and until Subcontractor obtains at least an interim secret clearance from the DSS. This Agreement shall automatically terminate regardless of the Scheduled End Date identified and referred to above in the event Subcontractor loses his or her security clearance for any reason.

If the United States government extends the Project beyond the Scheduled End Date, WWLR may, in its sole discretion, offer the Subcontractor the opportunity to extend the Agreement through the extended Scheduled End Date for the Project.

R.R.  3.        **Payment (Pay):**

REDACTED

R.R.  4.        **Compensation:**

REDACTED

WorldWide Language Resources, Inc.
308 Person Street, Fayetteville, NC 28301  Tel: (910) 483-2881  Fax: (910) 483-2470

For internal use only:
ID: 1844
Revision: IL111907-1

Project: 76-106
Placement: Afghanistan
Program Manager: Amy Sweeney

Subcontractor will work seven (7) days per week for at least twelve (12) hours per day and that Subcontractor will be available on call for additional work as needed at all other times and twenty-four (24) hours daily. The Subcontractor may be required to live in field conditions, working and living with service personnel for extended periods of time. A sum in the amount of $3,000.00 monthly, for down range adjustments will be paid if applicable, based upon specific contract authorizations from the Scheduled Start Date to the Scheduled End Date. In addition and subject to paragraph 3 above, WWLR shall pay subcontractor a final contract completion payment in the amount of $0.00 upon the full and successful completion of the services agreed to be provided under this Agreement through the Scheduled End Date. This final contract completion payment is only allowed on subcontract terms of one year. Payment shall be made directly into Subcontractor's bank account. The Subcontractor will provide WWLR with all necessary bank account information before beginning service under this Agreement. As the Subcontractor is not an employee, Subcontractor shall not be entitled to paid vacation from either the United States government or WWLR during the term of this Agreement.

The Subcontractor is responsible for all federal and state taxes. In addition, because the Subcontractor is an independent contractor and not an employee, there will be no employment benefits provided pursuant to this Agreement. WWLR shall provide Subcontractor with a Tax Form 1099 annually.

In the event that the Agreement is extended, subject to Paragraphs 2 and 3, WWLR will continue to pay and/or compensate the Subcontractor until the new Scheduled End Date.

As Subcontractor is not an employee, Subcontractor shall not be entitled to any benefits from either the United States Government or WWLR, or to any benefits or compensation not expressly set forth in this Agreement. Subcontractor shall be responsible to obtain all benefits and insurance necessary and appropriate for him or her to provide the services called for under this Agreement.

*P. R.*  4.1.    **CONUS Compensation:**

REDACTED

*P. R.*  5.    **Travel:** Travel shall be paid by the United States government between the United States and the Placement Area at the beginning of the Project. Travel at the end of the Project, including but not limited to expenses for return flight, shall not be paid unless and until Subcontractor returns all gear and identification documentation, including but not limited to Common Access Cards that had been provided him or her by either WWLR or the United States government during the term of this Agreement or prior to but in anticipation of Subcontractor's performance under this Agreement, and unless and until Subcontractor submits to an audit verifying the return of all such materials. Subject to Paragraph 3 above, WWLR will pay the Subcontractor $100 per day for travel time, not to exceed three (3) days to travel to the site and not to exceed two (2) days to return to the United States. Travel to the United States must be

3

made within seven (7) days of the end of the Project or the termination of this Agreement by WWLR, whichever comes first. Should the Subcontractor fail to complete return travel within 7 (seven) days, the Subcontractor will be responsible for his or her own transportation from the Placement Area. In addition, if the Subcontractor terminates the Agreement before the Project is completed, Subcontractor shall be responsible for his or her own transportation from the Placement Area. Under no circumstances will WWLR be required to pay for Subcontractor's travel in the event the United States government fails or refuses to pay.

*R.P*    6.    **Common Access Card:** Upon completion/termination of contract, Subcontractor agrees to turn in issued Common Access Card(s) to WWLR. Failure to turn in Common Access Card(s), or any other United States government-issued identification, will result in delay of final payment. Additionally, the Subcontractor acknowledges that he or she is directly responsible for any equipment issued to him or her by a United States government authority. WWLR will not take ownership of equipment issued by the United States government to the Subcontractor. Return of any such equipment, in whole or in part, is the sole responsibility of the Subcontractor. WWLR may hold the Subcontractor's last payment to cover the cost of any equipment issued by the United States government until the equipment is returned to WWLR, so that WWLR may account for such equipment and return it to the United States government.

*R.P*    7.    **Drug Testing:** Pursuant to federal law and regulations, and as required by the United States government, drug testing may be required prior to deployment to Subcontractor's final destination. Drug testing will be performed by the United States government at Subcontractor's location in the Placement Area on a random basis throughout the term of this Agreement.

*R.P*    8.    **Compliance with Military Regulations:** Compliance with all military regulations is mandatory. All Subcontractors shall be responsible for making themselves knowledgeable of all applicable military regulations and orders related to their services generally, their conduct, and to their presence at the Placement Area, and Subcontractors will be subject to any discipline ordered by the United States government for failure to comply, including monetary penalties for failure to comply with any applicable military regulation or order at the Subcontractor's placement. The United States government's penalty for smoking in any area that is not a designated smoking area is five hundred dollars ($500.00). The penalty assessed for noncompliance with other applicable military regulations shall be determined by the United States government based upon the circumstances, including the severity and frequency of the noncompliance by the Subcontractor. Failure to comply with military regulations or orders shall provide WWLR a basis to terminate this Agreement on a "for cause" basis.

*R.P*    9.    **Photo Release:** Subcontractor agrees that under this Agreement, WWLR is authorized to use any/all photographs, video recordings, audio recordings, statements and other forms of documentation of work performed under this Agreement for marketing, recruiting, and other business related purposes.

*R.P*    10.    **Termination by WWLR:** WWLR may terminate the Agreement on a "for cause" basis if, in its sole discretion, it determines that the Subcontractor has committed serious misconduct (including, but not limited to, embezzlement of funds; a violation of any of the provisions of this Agreement; harassment of a client (including but not limited to the United States government) or another

WorldWide Language Resources, Inc.
308 Person Street, Fayetteville, NC 28301  Tel: (910) 483-2881  Fax: (910) 483-2470

For internal use only:
ID: 1844
Revision: IL111907-1

Project: 76-106
Placement: Afghanistan
Program Manager: Amy Sweeney

linguist/translator/interpreter) or has failed to perform satisfactorily according to this Agreement. In addition, if the United States government requests that the Subcontractor be terminated from the Project, WWLR shall be able to terminate the Agreement without further obligation to Subcontractor. This Agreement may also terminate if the Project is terminated, as provided in Paragraph 2. If WWLR terminates the Agreement without cause to do so or without instruction to do so from the United States government or for reasons not referred to in paragraph 2 of this Agreement, however, it shall pay Subcontractor a termination fee of $1,000, and shall have no further liability to Subcontractor. WWLR's obligations to the Subcontractor pursuant to this Agreement, including any obligation for further payment (with the exception of payment of the $1,000 termination fee in the event that WWLR terminates the Agreement without cause to do so) shall cease immediately upon termination of this Agreement. In all events of termination, paragraph 9 and 11 through 16 shall survive and remain in full force and effect.

P.P 11. **Confidentiality of WWLR's Confidential and Proprietary Information:** The parties agree and acknowledge that WWLR has acquired knowledge and experience in the business of providing analyst, screener, translation and interpretation services and has acquired contracts with its clients at significant expense. The parties also agree and acknowledge that WWLR maintains lists and files containing information on actual and prospective clients and analysts, screeners, linguists, interpreters and translators, which information is a valuable, special, and unique asset of its business. Subcontractor acknowledges that, as a result of his or her performance of this Agreement, he or she has or will become aware of (a) the information referred to above; (b) other information related to WWLR's business affairs and operations; (c) WWLR's financial information, pricing practices, and other similar economic information; (d) the identity of any and all of the subcontractors, linguists, analysts, screeners, interpreters, translators, employees and independent contractors with whom WWLR works; and, (e) confidential information regarding the business needs of customers of WWLR (all of which shall be collectively referred to as "Confidential and Proprietary Information"). Because the disclosure of any portion of the Confidential and Proprietary Information likely would result in detriment to WWLR and/or its clients, including but not limited to the United States government, Subcontractor agrees to maintain this information as completely confidential at all times, including after the termination of this Agreement, and further agrees not to use, duplicate, record, or otherwise reproduce, in whole or in part, any portion of the Confidential and Proprietary Information or otherwise to disclose or make available any of the Confidential and Proprietary Information to any unauthorized person or entity. Subcontractor further agrees that, immediately upon WWLR's request and in any event upon the termination of this Agreement, he or she shall turn over to WWLR all documents and other materials (including all physical and electronic copies of these documents and materials) which are in his or her possession, custody, or control, any portion of which contains or was derived from Confidential and Proprietary Information, as well as all documents, notes, electronic files, and other work product in any way connected with or derived from Subcontractor's performance of this Agreement.

P.P 12. **Covenant Not To Compete/Project Extension:** Subcontractor acknowledges that, as a result of performance of this Agreement, he or she likely will gain substantial knowledge, contacts and Confidential and Proprietary Information in connection with WWLR's business, and that he or she may develop the capability and reputation at WWLR's expense which could enable him or her to compete with WWLR in the business of providing linguists or other personnel capable of providing translation and interpretation services and/or other services, including but not limited to analyst and screener services, sought by the United States government. The Subcontractor further acknowledges that WWLR invests a

5
WorldWide Language Resources, Inc.
308 Person Street, Fayetteville, NC 28301 Tel: (910) 483-2881 Fax: (910) 483-2470

For internal use only:
ID: 1844
Revision: [L]11907-1

Project: 76-106
Placement: Afghanistan
Program Manager: Amy Sweeney

Case 5:08-cv-00373-D   Document 1-2   Filed 08/11/08   Page 33 of 45

significant amount of time and effort to provide advanced training and support to its Subcontractors generally, and to Subcontractor in particular. WWLR desires that the Subcontractor not use his or her knowledge of WWLR's business and/or its Confidential and Proprietary Information, contacts, reputation and Confidential and Proprietary Information gained from his or her work with WWLR in a manner which may diminish or impair the value of WWLR's Agreement with the Subcontractor. For this reason, the Subcontractor covenants and agrees that for the entire term of the Agreement, and for 9 (nine) full months thereafter, he or she will not, whether on his or her own behalf or on behalf of any other person or entity, including but not limited to the United States government, compete with WWLR in any manner, either directly or indirectly, with respect to providing any product or service offered by WWLR, including but not limited to providing analyst, screener, translation and interpretation services or linguists or other personnel capable of providing translation and interpretation services and/or other services, including but not limited to analyst and screener services, sought by the United States government, in the Placement Area or the Placement Areas where the Subcontractor has worked under this Agreement. The Subcontractor further covenants and agrees not to participate in the development, management, ownership or operation of any business that provides analyst, screener, translation or interpretation service of any kind or which provides linguists or other personnel capable of providing translation and interpretation services and/or other services, including but not limited to analyst and screener services, in the Placement Area or Placement Areas where the Subcontractor has worked under this Agreement for the term of the Agreement and for nine (9) full months thereafter, nor shall the Subcontractor invest in, own or have any other interest in any corporation, partnership, association or other entity which provides any translation and interpretation services or linguists or other personnel capable of providing translation and interpretation services and/or other services, including but not limited to analyst and screener services, sought by the United States government, in the Placement Area or the Placement Areas where the Subcontractor has worked under this Agreement. Owning stock in a publicly traded entity in the business of analyst, screener, translation or interpretation services alone shall not constitute a breach of this provision unless the Subcontractor owns more than ten percent (10%) of the stock in said entity.

This Agreement shall terminate immediately if the Subcontractor is offered an extension of the Agreement, but refuses to continue to provide services in support of the Project. Subcontractor shall remain bound by all covenants described herein until the completion of a full nine (9) full months after the termination of this Agreement for any reason. WWLR shall not be obligated to pay any termination fee or any travel expenses.

R.R. 13.    **Non-Solicitation:** The Subcontractor further acknowledges that WWLR is engaged in the highly competitive business of recruiting and placing analysts, screeners, linguists, interpreters and translators on a temporary and/or permanent basis, and that WWLR has expended substantial amounts of money, time and effort in developing and maintaining its extensive personnel resources and business goodwill. The Subcontractor acknowledges that the Subcontractor's services will necessarily include the entrustment of WWLR's Confidential and Proprietary Information to the Subcontractor and the introduction of WWLR's customers, employees and contractors, including but not limited to analysts, screeners, linguists, interpreters and translators to the Subcontractor. Subcontractor further acknowledges that Subcontractor will have access to Confidential and Proprietary Information as a necessary part of performing Subcontractor's services as described herein.

For the term of this Agreement and for nine (9) months thereafter, Subcontractor covenants

6
WorldWide Language Resources, Inc.
308 Person Street, Fayetteville, NC 28301 Tel: (910) 483-2881 Fax: (910) 483-2470

For internal use only:
ID: 1844
Revision: IL111907-1

Project: 76-106
Placement: Afghanistan
Program Manager: Amy Sweeney

Case 5:08-cv-00373-D   Document 1-2   Filed 08/11/08   Page 34 of 45

and agrees neither to solicit nor to attempt to hire, on his or her own behalf or on behalf of any other person or entity, any person who is or was an employee of WWLR or a subcontractor for WWLR during the term of this Agreement and/or during any time within the one (1) year preceding this Agreement, nor to attempt to influence any such person to terminate his or her relationship with WWLR. For the entire duration of this Agreement, and for nine (9) months thereafter, Subcontractor covenants and agrees not to solicit for any reason any person or entity who was a client of WWLR during the term of this Agreement or during any time within the one (1) year preceding the termination of this Agreement and with whom the Subcontractor had contact, nor to attempt to influence any such person or entity to terminate any relationship with WWLR, whether or not such solicitation or attempt to influence involves the use of Confidential and Proprietary Information.

_RR_ 14. **Severability:** The parties agree that, in the event that any part of this Agreement shall be held to be invalid or unenforceable for any reason whatsoever, the remaining portions of this Agreement shall nevertheless continue to be valid and enforceable. The parties further agree that, in the event that any of the provisions of this Agreement relating to the duration and/or geographic scope of the Agreement are deemed to exceed the limitations which a court of competent jurisdiction would deem reasonable and enforceable under the circumstances, then the duration and/or geographic scope of this Agreement shall be deemed, without further action on the part of any person, to be modified so as to be equal to the maximum duration and/or geographic scope limitations which are reasonable and enforceable under the circumstances.

_RR_ 15. **Enforcement of Agreement and Injunctive Relief:** The parties agree that Subcontractor's violation of any of the covenants contained in this Agreement will cause irreparable harm to WWLR, and further agree that WWLR shall have the right to immediate injunctive relief. This remedy shall not be exclusive and shall be in addition to any other remedies available at law or equity. The parties further agree that Subcontractor shall be liable to WWLR for all costs and fees incurred by WWLR in enforcing any term of this Agreement, including but not limited to costs and fees incurred in pursuit of injunctive relief and all other remedies available at law or equity, including attorneys' fees, paralegal fees, and any and all related costs and expenses. Subcontractor further covenants and agrees that he or she will bear his/her own legal fees, costs or any expenses incurred relating in any way to the enforcement, breach, or challenge to this Agreement, including but not limited to any of the covenants set forth herein or any other provisions, regardless of the provisions of any contrary or inconsistent common or statutory law.

_RR_ 16. **Extension of Duration of Covenants in Event of Breach:** The parties agree that any breach of this Agreement by Subcontractor shall extend the duration of any covenants contained in this Agreement for a period equal to the period during which Subcontractor is in breach of his/her obligations under this Agreement.

_RR_ 17. **Devotion of Efforts:** As required by the United States government for the performance of the services described herein, Subcontractor shall not, directly or indirectly, alone or as a member of a partnership, or as an officer, director, principal shareholder, employee, servant, agent or representative of any corporation, business entity, or individual(s), engage, or participate in any other duties or pursuits whatsoever which may limit his/her ability to perform the services described in this Agreement or which conflict or compete with the performance of this Agreement.

7

WorldWide Language Resources, Inc.

308 Person Street, Fayetteville, NC 28301 Tel: (910) 483-2881 Fax: (910) 483-2470

For internal use only:
ID: 1844
Revision: IL111907-I

Project: 76-106
Placement: Afghanistan
Program Manager: Amy Sweeney

R.P  18.    **Media Clause:** As required by the United States government, and in the interests of National and Corporate Security, the Subcontractor agrees not to contact, respond to, or otherwise communicate with the media regarding assigned duties from WWLR or the United States government. Subcontractor agrees that all media inquiries must be directed to the Facility Security Officer, AND either the Director of Business Development, or the President of WWLR. Subcontractor agrees not to initiate any contact with the media of any region, city, nation, or entity. In addition, Subcontractor agrees not to make any news release including photographs, films, public announcements, or confirmation of the same, on any part of the subject matter of this Agreement or any phase of any program hereunder. Subcontractor further agrees that no such contact shall be made without the written consent of WWLR and the United States government. Also, the Subcontractor shall not market his or her presence through displays of signs, placards, logos, and the like at the Placement Area without the express written consent of WWLR and the United States government. Any initiation of contact with, or response to the media by the Subcontractor may result in immediate termination of the Agreement, and the Subcontractor shall be responsible for funding travel out of assigned duty location. WWLR shall not be responsible for any termination fee in this event.

R.P  19.    **Reasonableness of Agreement:** By signing below, Subcontractor acknowledges that he or she has read this Agreement, that he or she had the opportunity to retain counsel to review the Agreement, and that he or she agrees that the terms of this Agreement are fair and reasonable for the protection of the interests of the United States government and WWLR.

R.P  20.    **Entire Agreement:** This Agreement constitutes the entire agreement between the parties. It cancels and supersedes any prior oral or written agreement or understanding among or between the parties relating to the subject matter of this Agreement.

R.P  21.    **Amendments:** This Agreement may be changed only by a written instrument signed by both of the parties.

R.P  22.    **Successors and Assigns:** All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of any successors or assigns of WWLR.

R.P  23.    **Governing Law:** With respect to paragraphs 11, 12, and 13, and paragraphs 14, 15, 16, 19, 20, 21, and 22 insofar as they apply to paragraphs 11, 12 and 13, this Agreement shall be construed and enforced in accordance with the laws of the State of North Carolina. All other parts of this Agreement, and paragraphs 14, 15, 16, 19, 20, 21, and 22 insofar as they apply to those other parts, shall be construed and enforced in accordance with Federal law and not state law. The parties agree that this Agreement may be enforced in any court of competent jurisdiction within the State of North Carolina. The parties further agree that service of any process necessary for the prosecution of an action arising out of this Agreement may be made either in person or by Certified First Class U.S. Mail to the addresses of the respective parties as set forth in this Agreement, and that such service may be effected by any individual over the age of twenty-one (21), and that a signed acknowledgement of service shall be conclusive proof that service was effected properly.

R.P  24.    **No Paid Leave:** The parties agree that the Subcontractor shall not be entitled to take any paid leave during the term of this Agreement.

8

WorldWide Language Resources, Inc.
308 Person Street, Fayetteville, NC 28301 Tel: (910) 483-2881 Fax: (910) 483-2470

For internal use only.
ID: 1844
Revision: TL111907-1

Project: 76-106
Placement: Afghanistan
Program Manager: Amy Sweeney

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

Powezu1 Ruzzou1
Subcontractor's Signed Name

01-08-08
Date

PAMAZAU RJIZGALI
Subcontractor's Printed Name

_____          _____
Director of Operations                    Date
WorldWide Languages Resources, Inc.

9

WorldWide Language Resources, Inc.
308 Person Street, Fayetteville, NC 28301  Tel: (910) 483-2881  Fax: (910) 483-2470

For internal use only:
ID: 1844
Revision: IL111907-1

Project: 76-106
Placement: Afghanistan
Program Manager: Amy Sweeney

WYRICK
ROBBINS
YATES
&PONTON
LLP

ATTORNEYS AT LAW

The Summit
4101 Lake Boone Trail
Suite 300
Raleigh, NC 27607.7506

PO Drawer 17803
Raleigh, NC 27619

ph 919.781.4000
fax 919.781.4865
www.wyrick.com

BENJAMIN N. THOMPSON
bthompson@wyrick.com

August 5, 2008

## VIA FAX (614-416-2346) & MAIL

Mission Essential Personnel, LLC
ATTN.: Mr. Chad Monnin, CEO
4343 Easton Commons, Suite 100
Columbus, OH 43219

## VIA U.S. MAIL ONLY

Mission Essential Personnel, LLC
ATTN. Registered Agent
CT Corporation System
1300 East 9th Street
Cleveland, OH 44114

Re:   Tortious Interference & Unfair Competition with WorldWide Language
      Resources, Inc.

Dear Mr. Monnin:

This law firm represents WorldWide Language Resources, Inc. ("WWLR"). Please
address any further correspondence regarding the matters addressed in this letter to our attention.

WWLR recently discovered that MEP is hiring WWLR's employee/subcontractor-
linguists to work for MEP in Afghanistan in violation of covenants not to compete, which all
WWLR linguists sign as a condition of their employment with WWLR. By way of example,
WWLR is informed and believes that MEP recently induced Ramazan Ruzgani to accept and
continue employment with MEP in Afghanistan as a linguist in breach and violation of
Ruzgani's WWLR Independent Subcontractor Agreement (copy attached). Additionally,

999999.1-545873 v1

EXHIBIT

D

ALL-STATE LEGAL®

Mission Essential Personnel, Inc.
August 5, 2008
Page 2 of 2

WWLR is informed and believes that MEP is actively soliciting numerous other WWLR employee/subcontractor-linguists to be employed or otherwise engaged by MEP in breach and violation of their WWLR covenants not to compete, as part of an orchestrated, unlawful employee-raiding scheme. Be aware that WWLR is investigating this unlawful conduct, as well as additional instances of unfair competition and/or deceptive trade practices by MEP involving MEP's raiding of WWLR employees, subcontractors and prospects and/or confidential business information, among other things.

As an employer in a highly competitive industry, we are certain that MEP fully appreciates how important it is for employees to honor their post-employment/engagement agreements, and that the courts routinely enforce such agreements. Thus, WWLR hereby demands that MEP immediately cease and desist from employing or otherwise engaging Ruzgani and/or any other current or former WWLR employee/subcontractor in breach and violation of the covenants not to compete that they signed as a condition of employment with WWLR.

We trust that in addition to taking the above-requested measures, MEP will take any and all additional steps necessary to cease its raiding scheme and to avoid aiding and abetting Ruzgani or any other current or former WWLR employee/subcontractor in the violation of their WWLR contracts and that MEP will in no way encourage or induce Ruzgani or any other current or former WWLR employee/subcontractor to further violate the terms of their WWLR contracts.

Be aware that WWLR will avail itself to all available legal recourse to put a stop to and seek redress for any and all unlawful conduct by MEP. In the event formal legal action is required, WWLR will seek to recover any and all available relief, including actual economic damages, costs and attorneys' fees, as well as treble and/or punitive damages.

WWLR reserves all rights, remedies and privileges it may have, at law or in equity, arising from your conduct. Accordingly, we urge MEP to give this matter its immediate attention.

Sincerely,

WYRICK ROBBINS YATES & PONTON LLP

Benjamin N. Thompson

999999.1-545873 v1

STATE OF NORTH CAROLINA

COUNTY OF CUMBERLAND

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO.: _08 CVS 7995_

WORLDWIDE LANGUAGE
RESOURCES, INC.,

    Plaintiff,

v.

MISSION ESSENTIAL PERSONNEL,
LLC and RAMAZAN RUZGANI,

    Defendants.

**TEMPORARY RESTRAINING ORDER**



This matter came to be heard and being heard before the undersigned Superior Court Judge upon Plaintiff's Motion for a Temporary Restraining Order; and

IT APPEARING TO THE COURT, upon review of Plaintiff's Verified Complaint, as well as the exhibits to the foregoing, that:

1.    Plaintiff Worldwide Language Resources, Inc. ("WWLR") has shown a substantial likelihood of success on the merits of this action;

2.    WWLR has no adequate remedy at law which will prevent Defendants Mission Essential Personnel, LLC ("MEP") and Ramazan Ruzgani ("Ruzgani") from continuing to harm Plaintiff by Defendants' conduct as set forth herein unless a restraining order is entered;

3.    Defendant Ruzgani is employed or about to be employed by Defendant MEP as a linguist within the time and territory restricted by the covenant not to compete in his Independent Subcontractor Agreement ("Agreement");

4.    Defendant MEP has aided and abetted Defendant Ruzgani in the breach of his Agreement and/or otherwise interfered with the Agreement between Ruzgani and WWLR by inducing and allowing Ruzgani to accept and continue employment with MEP as a linguist within the time and territory restricted by the covenant not to compete in Ruzgani's Agreement,

and Defendant MEP has engaged in unfair competition and/or deceptive trade practices by raiding and/or attempting to raid WWLR's current employees and/or independent subcontractors (in breach of and without regard for their covenants not to compete) and prospective employees and/or independent subcontractors (whom MEP has maliciously instructed to complete processing with and at the expense of WWLR before accepting employment with MEP).

5.      Defendants' unlawful conduct as described herein above is currently causing WWLR damages that are difficult or impossible to prove. Accordingly, the issuance of a restraining order is necessary for the protection of WWLR's rights until the preliminary injunction can be heard;

6.      WWLR is likely to suffer immediate and irreparable harm because Defendants' conduct as described herein is causing WWLR to suffer a loss of goodwill and competitive advantage within North Carolina and beyond.

7.      A balancing of the equities supports the issuance of a restraining order in favor of WWLR and against Defendants; and

7.      The public interest will not be harmed by the granting of this temporary restraining order.

## IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

A.      Pursuant to Rule 65(b) of the North Carolina Rules of Civil Procedure, Defendant Ruzgani is immediately enjoined and restrained, until the earlier of the passage of ten (10) days or until further Order of this Court, from violating the restrictive covenants memorialized in Paragraphs 11, 12 and 13 of the Agreement, as follows:

(1)      Ruzgani shall not use or disclose to MEP (or to any other person or entity) WWLR's Confidential and Proprietary Information, as defined in the Agreement;

(2)  Ruzgani shall not, directly or indirectly, induce, influence or advise any employee, officer or agent of WWLR (a) to terminate their relationship with WWLR, or (b) to accept employment with MEP; and

(3)  Ruzgani shall not, whether on his or her own behalf or on behalf of any other person or entity, including but not limited to the United States government, compete with WWLR in any manner, either directly or indirectly, with respect to providing any product or service offered by WWLR, including but not limited to providing analyst, screener, translation and interpretation services or linguists or other personnel capable of providing translation and interpretation services and/or other services, including but not limited to analyst and screener services, sought by the United States government, in the Placement Area or the Placement Areas where the Subcontractor has worked under the Agreement;

B.  Pursuant to Rule 65(b) of the North Carolina Rules of Civil Procedure, Defendant MEP is immediately enjoined and restrained, until the earlier of the passage of ten (10) days or until further Order of this Court, from:

(1)  Aiding and abetting Defendant Ruzgani and/or any other current WWLR employee or independent subcontractor in the violation of a covenant not to compete agreement with WWLR by encouraging or allowing such employee or independent subcontractor to accept or continue employment or other engagement with WWLR within the time and territory restricted by such contract and/or otherwise interfering with the contracts between WWLR and its employees or independent subcontractors;

(2)  Employing or otherwise engaging any current or former WWLR employee or subcontractor restricted by contract from such employment or other engagement; and

(3)    Compensating any current or former WWLR employee or subcontractor for employment or other engagement prohibited by such employees' or subcontractors' contract(s) with WWLR.

C.    Pursuant to Rule 65(b) of the North Carolina Rules of Civil Procedure, the Court finds that in the absence of a Temporary Restraining Order, WWLR would likely suffer irreparable injury because Defendants are violating and/or aiding and abetting the violation of Ruzgani's Agreement and/or unfairly competing with WWLR.

D.    The Court finds that this harm is irreparable because WWLR is likely without legal recourse to recoup the resources, expenses and loss of competitive advantage and goodwill from the Defendants' unlawful conduct as described herein above, which infringes on the rights of WWLR.

E.    The Temporary Restraining Order remains in effect until the Preliminary Injunction hearing. The parties shall appear before the Honorable Superior Court Judge Presiding, Cumberland County Superior Court, at _9:30_ _a_.m. on the _18th_ day of _August_, 2008, for a hearing to determine whether this Temporary Restraining Order should be converted to a preliminary injunction and continued in force pending a final determination of the issues raised in this action.

F.    In addition to Defendants, the forgoing restrictions also bind anyone acting in active concert or participation with Defendants who actually receives actual notice of this order.

G.    Plaintiff shall post a bond of $ _1,000.00_ to indemnify Defendants from any damage incurred by reason of this Order.

SO ORDERED this _6_ day of August, 2008, at _9:2:55 P_.m.

_(signature)_

SUPERIOR COURT JUDGE

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
                                 SUPERIOR COURT DIVISION
COUNTY OF CUMBERLAND             CASE NO.: 08 CVS 7995


WORLDWIDE LANGUAGE
RESOURCES, INC.,

          Plaintiff,                              **BOND**

v.

MISSION ESSENTIAL PERSONNEL,
LLC and RAMAZAN RUZGANI,

          Defendants.


WHEREAS in the above-captioned case, pending in Cumberland County Superior Court,

styled *WorldWide Language Resources, Inc. v. Mission Essential Personnel, LLC and Ramazan*

*Ruzgani*, the Honorable ___Jack Thompson___ did on the 6th day of August, 2008,

sign an Order granting a Temporary Restraining Order against Defendants Mission Essential

Personnel, LLC and Ramazan Ruzgani (collectively, "Defendants") and requiring Plaintiff

WorldWide Language Resources, Inc. ("WorldWide") to make, execute, and file a Temporary

Restraining Order Bond in the sum of ___One Thousand___ dollars ($ 1,000.00 ), or a

cash deposit in lieu of the Temporary Restraining Order Bond, payable to the adverse parties

before issuance of the Temporary Restraining Order; therefore,

KNOW ALL BY THESE PRESENTS: that the undersigned Plaintiff, as principal, is

held and firmly bound unto Defendants in the sum of ___One Thousand___ dollars

($ 1,000.00 ) for the payment of which will and truly to be made we bind ourselves firmly by

these presents:

PLDG-20943-2-545887-02

The condition of the foregoing obligation is such that if the said principal pays all damages and costs which any person may sustain by the suing out of such preliminary injunction or restraining order if the same is dissolved, this obligation to be void; otherwise to remain in full force and effect.

WITNESS this the _26_ day of August, 2008.

Principal: ~~Lawrence P. Costa, President~~ *Gene Battishni*
WorldWide Language Resources *Director of operations*
308 Person Street
Fayetteville, NC 28301

Received and approved this the ____ day of August, 2008.

_____
Clerk of Superior Court